1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CLIFFORD LEE BAIR,

11              Petitioner,                   No. CIV S-04-2257 MCE GGH P

12        vs.

13   FOLSOM STATE PRISON, et al.,            AMENDED

14              Respondent.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  In 1984, petitioner was convicted of first degree murder,

19   three counts of burglary, two counts of false imprisonment, three counts of grand theft, two

20   counts of receiving stolen property and one count of destruction of phone lines.  Answer, Exhibit

21   A.  He is serving a sentence of 27 years to life.  Id.

22              In the instant action, petitioner challenges the 2003 decision by the California

23   Board of Prison Terms (BPT) finding him unsuitable for parole.  This was petitioner's second

24   parole suitability hearing.  Answer Exhibit C.  Petitioner raises the following claims: 1) Cal.

25   Penal Code § 3041 creates a liberty interest in a presumptive parole release date; 2) the BPT did

26   not have sufficient evidence to find that petitioner posed an unreasonable risk of danger to

1

1   society if released on parole; 3) the BPT did not have sufficient evidence to find him unsuitable

2   for parole; 4) the failure of the BPT to set a term proportionate to petitioner's offense violates the

3   Eighth and Fourteenth Amendments.

4          On July 7, 2005, the court recommended that the petition be denied.  However, on

5   June 15, 2005, in Sass v. Cal. Board of Prision Terms, __F. Supp. 2d __, 2005 WL 1406100

6   (E.D. Cal. 2005), Judge England held that the California parole scheme for indeterminate

7   sentences does not create a federal liberty interest.  At the time Judge England decided Sass, the

8   findings and recommendations in this action had already been prepared.  The court now vacates

9   the July 7, 2005, findings and recommendations and recommends that the petition be denied

10  pursuant to Sass.  However, the court respectfully requests that Judge England reconsider Sass

11  and deny the petition on the alternative grounds discussed below.

12          II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

13          The AEDPA applies to this petition for habeas corpus which was filed after the

14  AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy,

15  117 S. Ct. 2059 (1997).   The AEDPA "worked substantial changes to the law of habeas corpus,"

16  establishing more deferential standards of review to be used by a federal habeas court in

17  assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

18  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

19          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

20  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

21  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

22  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

23  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

24  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

25  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

26  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

2

1    "Unreasonable application" of established law, on the other hand, applies to

2    mixed questions of law and fact, that is, the application of law to fact where there are no factually

3    on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

4    Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

5    AEDPA standard of review which directs deference to be paid to state court decisions.  While the

6    deference is not blindly automatic, "the most important point is that an *unreasonable* application

7    of federal law is different from an incorrect application of law....[A] federal habeas court may not

8    issue the writ simply because that court concludes in its independent judgment that the relevant

9    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

10   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

11   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

12   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

13   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

14   The state courts need not have cited to federal authority, or even have indicated

15   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

16   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

17   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

18   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

19   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

20   established Supreme Court authority reviewed must be a pronouncement on constitutional

21   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

22   binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

23   However, where the state courts have not addressed the constitutional issue in

24   dispute in any reasoned opinion, the federal court will independently review the record in

25   adjudication of that issue.  "Independent review of the record is not de novo review of the

26   constitutional issue, but rather, the only method by which we can determine whether a silent state

1  court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

2  2003).

3       The Sonoma County Superior Court issued a reasoned opinion addressing

4  petitioner's claim alleging insufficient evidence to support the suitability finding.  Answer,

5  Exhibit E.  The California Supreme Court issued a summary denial of petitioner's habeas petition

6  challenging the 2003 hearing.  Answer, Exhibit D.  Accordingly, the court "looks through" the

7  summary disposition to the last reasoned decision, i.e. the opinion of the Superior Court, in

8  determining whether the state courts reasonably applied clearly established Supreme Court

9  authority in denying petitioner's claim that there was not sufficient evidence to find him

10  unsuitable.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (citing Ylst v.

11  Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590 (1991)).

12       No state court issued a reasoned decision addressing petitioner's claims that Cal.

13  Penal Code § 3041 requires the BPT to set a parole date and that his sentence is disproportionate.

14  Accordingly, the court will conduct an independent review of these claims.

15  III.  Discussion

16       A.  Insufficient Evidence

17       In claim two petitioner alleges that the BPT did not have sufficient evidence on

18  which to base the finding that petitioner would pose an unreasonable risk of danger if released.

19  In claim three, petitioner alleges that there was not sufficient evidence to support the BPT's

20  finding of unsuitability.  These claims both challenge the sufficiency of the evidence on which

21  the BPT found him unsuitable.

22       *1. California Parole Criteria*

23       In Sass v. Cal. Board of Prison Terms, ___ F. Supp. 2d ___, 2005 WL

24  1406100 (E.D.Cal. 2005), Judge England found that the California parole scheme for

25  indeterminate sentences does not create a federal liberty interest.  Sass v. Cal. Board of Prision

26  Terms, __ F. Supp. 2d __, 2005 WL 1406100 (E.D. Cal. 2005) (Honorable Morrison England).

Pursuant to Sass, petitioner's claim that the BPT did not have sufficient evidence on which to base the finding of unsuitability must fail.

For the following reasons, this court respectfully requests that the holding in Sass be reconsidered and that petitioner's application be denied on the alternative grounds discussed below.

Although due process does not require the existence of a parole scheme, California has established one. Not all of the myriad procedures of the parole setting system are pertinent here. The court sets forth that part of the statutory section that is pertinent:

> (a) In the case of any prisoner sentenced pursuant to any provision of law, other than Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, the Board of Prison Terms shall meet with each inmate during the third year of incarceration for the purposes of reviewing the inmate's file, making recommendations, and documenting activities and conduct pertinent to granting or withholding postconviction credit. One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the Board of Prison Terms shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. The panel shall consist solely of commissioners or deputy commissioners from the Board of Prison Terms.
>
> The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime.

Cal. Penal Code § 3041.

In compliance with the statutory mandate, the Board of Prison Terms issued regulations which guide it in finding prisoners convicted of life offenses with parole eligibility for parole setting. Cal. Code Regs. tit. 15, § 2402 sets forth the criteria for determining whether an inmate is suitable for parole. Section 2402(a) provides that regardless of the length of time served, a prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

5

Section 2402(c) sets forth the circumstances tending to show unsuitability.  The court lists those of significance here:

(1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style manner.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

*****

*****

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

Section 2402(d) sets forth the circumstances tending to indicate suitability:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome . . .

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

The Ninth Circuit has held that California's parole scheme gives rise to a cognizable liberty interest in release on parole.  Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003).  Only one aspect of that liberty interest is of pertinence here:  "In the parole context, the requirements of due process are met if 'some evidence' supports the decision."  Id.  The evidence underlying the board's decision must have some indicia of reliability.  Id.

In Biggs, the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation.  Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction. In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner.  334 F.3d at 913.  While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three:  1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy.  334 F.3d at 913.

The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

334 F.3d at 916.

The Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." 334 F.3d at 917.

<u>Biggs</u> is in conformance with the stated goals of California's parole establishment system—that is, the goal is not to release persons who will be a danger to the community if released. Clearly, when looking at the commitment offense in terms of this goal, one would attempt to use it for its predictive value. The more violent, thoughtless, and callous the crime, the more likely it could be said that the perpetrator would exhibit those tendencies again. One who not only killed, but excessively violated society's norms, is a person less likely to care about those norms when released. But, the purpose of prison, aside from punishment, is to determine for parole eligibility purposes when, if ever, these presumptions have been confirmed or rebutted.

The California Supreme Court, having once seemingly agreed with the Ninth Circuit, <u>see</u> <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 683 (2002), stating that in order for the BPT to put weight on the exceptional nature of the crime (murder), the murder had to be "particularly egregious," has now defined that term as simply "that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr. 3d 417, 440 (2005). Of course, as the dissent in <u>Dannenberg</u> pointed out, this standard is completely unreviewable. 34

1   Cal. 4th at 1102, 23 Cal. Rptr. 3d at 446.  The minimal elements of the crime are simply that a

2   person dies at the hands of another with the perpetrator exhibiting the requisite intent.  *Any* fact

3   in addition to this could be one viewed as "more than minimally necessary to convict."  For

4   example, one BPT panel may believe that use of a knife per se causes undue suffering; another

5   may believe use of any weapon where death is not instantaneous, probably the vast majority of

6   murders, exhibits callousness.  A conclusion can easily be reached by those who want to claim

7   that the facts of *any* murder are such that they prove more than those facts minimally necessary

8   for a conviction.

9          There can be no doubt that <u>Dannenberg</u> gives carte blanche to the BPT to issue a

10   mere characterization of the crime to support a denial of parole.  For the due process issue, the

11   question is whether AEDPA insulates this authority from review in habeas corpus.  Clearly,

12   federal due process is not defined by all the intricacies of state law regardless of whether the state

13   law gives rise to the protectable liberty interest.

14          Although state laws may in certain circumstances create a
       constitutionally protected entitlement to substantive liberty
15          interests, see, e.g., <u>Sandin v. Conner</u>, 515 U.S. 472, 483-84, 115
       S.Ct. 2293, 132 L.Ed.2d 418 (1995); <u>Tracy v. Salamack</u>, 572 F.2d
16          393, 396 & n. 9 (2d Cir.1978) (per curiam), state statutes do not
       create federally protected due process entitlements to specific
17          state-mandated procedures. "Elevating a state-mandated procedure
       to the status of a constitutionally protected liberty or property
18          interest, would make process an end in itself rather than a
       requirement whose constitutional purpose is to protect a
19          substantive interest in which the individual has a claim of
       entitlement." <u>Sealed v. Sealed</u>, 332 F.3d 51, 57 n. 5 (2d Cir.2003)
20          (quoting <u>Olim</u>, 461 U.S. at 250-51, 103 S.Ct. 1741, and <u>Doe v.
       Milwaukee County</u>, 903 F.2d 499, 503 (7th Cir.1990).

21

22   <u>Holcomb v. Lykens</u>, 337 F.3d 217, 224 (2nd Cir. 2003).

23          All that federal law requires for parole hearing due process is that the inmate up

24   for parole consideration be given a hearing with minimal rights and that the decision be

25   supported by "some evidence."  <u>Biggs</u>, <u>supra</u>.  Because the federal due process in parole

26   \\\\\

suitability hearings arises from a liberty interest created by state law,[1] state courts are generally free to define their law in connection with the liberty interests as the final arbiters of their state law.  Thus, in general, if state courts desire to define their state's parole criteria in a restrictive fashion, the liberty interest is characterized by those restrictive holdings.

However, state courts may not interpret their law in such an arbitrary manner that the interpretation is nothing but an evasion of the federal due process requirements, minimal as they may be.  "[W]e are bound by the state's construction [of state laws] except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue." Peltier v. Wright, 15 F.3d 860, 862 (9th Cir.1994); see also Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.1989) ("Our deference to the [state] Court is suspended only upon a finding that the court's interpretation [of state law] is untenable or amounts to a subterfuge to avoid federal review of a constitutional violation.").  The question ultimately to be decided here is whether the Dannenberg interpretation is so unreviewable, i.e., the facts underlying *any* murder can stand as "some evidence" to deny parole suitability, that the federal standard of "some evidence" is, in essence, completely eviscerated.

The undersigned is mindful that a majority of justices on the California Supreme Court in Dannenberg (4-3 decision) implicitly answered the question in the affirmative, although federal due process and liberty interests were not at issue per se in that case.  Therefore, it would, and should, be rare indeed that a lower court federal judge should find the decision of a state supreme court to be an unreasonable application of clearly established Supreme Court authority. The question goes so much further than whether the undersigned believes that the dissent had the better of the argument.  Even clear error is insufficient.  That having been said, the undersigned cannot find a justifiable reason to find that the determination was reasonable.

\\\\\

---

[1] Federal due process does not require that a state have a parole system.  Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 7, 99 S. Ct. 2100, 2104 (1979).

1    As it stands now, the law in California permits parole to be denied *solely* on the

2    basis of the nature of the crime.  "The nature of the prisoner's offense, alone, can constitute a

3    sufficient basis for denying parole."  In re Rosenkrantz, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d

4    1104 (2002).  However, the historical facts of the crime will never change, and all prisoners

5    having been found to have committed a crime with facts "more than minimally necessary to

6    convict," i.e., nearly everyone, can have their life with parole case effectively transmuted to life

7    without parole—because the facts of the offense will never change.  Under present California

8    law, the BPT does not set the sentence, and therefore due process does not permit the BPT to

9    change the court imposed sentence either *de jure* or *de facto*.

10    But, one might argue, a later panel may ultimately assess the unchangeable facts

11    of the case differently than a previous panel, or two, or three, etc.  This argument, however, gives

12    no substance to due process notions.  The argument would expressly hinge due process on the

13    luck of the draw, that is, maybe (but doubtful) a panel will come along that will view the facts as

14    not more than minimally necessary to convict.  Compelling due process to hinge on such an

15    arbitrary factor is no due process at all.

16    One final argument could be made to support the Dannenberg standard.  The BPT

17    is not *compelled* to deny parole solely on the basis of the "aggravated" nature of the crime.  But

18    this argument does not cure the due process defect either.  Simply because some inmates may, at

19    essentially the sole discretion of the BPT, receive a parole eligibility finding despite the existence

20    of an unreviewable and standardless "nature of the crime" factor (and not many inmates have) –

21    does not mean that the factor is therefore constitutional when used to deny parole.  The

22    deficiency in the factor is in its standardless, meaningless application per se when used to deny

23    parole suitability.  Due process in a particular case is adjudged on an individual, not statistical,

24    basis.  In other words, a due process violation against one person is not answered by reference to

25    another person who suffered no ultimate harm as a result of the violation.

26    /////

11

1        Thus, the undersigned must continue to follow <u>Biggs</u>.  Repeated application of the

2  severity of the crime factor will violate due process when the crime for which incarceration was

3  required grows more remote.  Although the Ninth Circuit in <u>Biggs</u> did not explicitly state when

4  reliance on an unchanging factor would violate due process, it makes sense that reliance on such

5  a factor becomes unconstitutional when the factor no longer has predictive value.

6        In <u>Sass</u>, Judge England found that no federal liberty interest was created because

7  the wording of the parole statute, Cal. Penal Code 3041(a) ("a panel *shall normally* set a release

8  date..) and § 3041(b) ("the panel...*shall set* a release date....") was insufficiently mandatory.

9  Judge England relied heavily on <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1098, 23 Cal. Rptr. 3d 417,

10  443 (2005) which admittedly, and as previously set forth, vested almost unlimited, unreviewable

11  discretion within the BPT when it came to determining parole eligibility.  However, even

12  assuming that the "old" Supreme Court paradigm regarding creation of a liberty interest

13  (mandatory act and underlying factual predicates) remains the analytical framework in which to

14  judge the creation of right-to-parole liberty interests, <u>see</u> e.g., <u>Board of Pardons v. Allen</u>, 482

15  U.S. 369, 378, 107 S. Ct. 2415, 2421(1987) (mandatory language in a parole statute creates a

16  "presumption of release" and gives rise to a liberty interest), California law, both before and after

17  <u>Dannenberg</u>, finds that the California parole scheme for indeterminate offenses does create a

18  liberty interest.

> 19    In sum, the governing statute provides that the Board *must grant
>     parole* unless it determines that public safety requires a lengthier
> 20    period of incarceration for the individual because of the gravity of
>     the offense underlying the conviction. (Pen.Code, § 3041, subd.
> 21    (b).) And as set forth in the governing regulations, the Board *must
>     set a parole date* for a prisoner unless it finds, in the exercise of its
> 22    judgment after considering the circumstances enumerated in section
>     2402 of the regulations, that the prisoner is unsuitable for parole.
> 23    (Cal.Code Regs., tit. 15, § 2401.) Accordingly, parole applicants in
>     this state *have an expectation that they will be granted parole*
> 24    unless the Board finds, in the exercise of its discretion, that they are
>     unsuitable for parole in light of the circumstances specified by
> 25    statute and by regulation.

26  <u>In re Rosenkrantz</u>,  29 Cal. 4th 616, 654, 128 Cal. Rptr. 2d 104, 138 (2003) (emphasis added).

It is difficult to conceive of words which mirror the requirements of the Allen mandatory-act-in

light-of-satisfied-factual-predicates paradigm more than the emphasized words of Rosenkrantz.

Indeed, Allen and Rosenkrantz use the same terminology, i.e. "presumption" of release and

"expectation" of release.  These are the words of liberty interest creation.  It is not material that

great discretion is vested within the administrative agency granting parole.  Allen supra.  See also

the post-Dannenberg case of In re DeLuna,126 Cal. App. 4th 585, 591, 24 Cal. Rptr. 3d 643, 647

(2005):

> Penal Code section 3041, subdivision (b) requires the Board to "set
> a release date unless it determines that the gravity of the current
> convicted offense or offenses, or the timing and gravity of current or
> past convicted offense or offenses, is such that consideration of
> public safety requires a more lengthy period of incarceration for this
> individual, and that a parole date, therefore, cannot be fixed at this
> meeting." *This statute creates a conditional liberty interest for a
> prospective parolee.* (Cf. Rosenkrantz, supra, 29 Cal.4th at p. 661,
> 128 Cal.Rptr.2d 104, 59 P.3d 174; McQuillion v. Duncan (9th
> Cir.2002) 306 F.3d 895, 901-902.) (emphasis added)[2]

The undersigned can only find that California law is in disarray on the subject of

liberty interest created by the California parole statutes.  Dannenberg did not overrule

Rosencrantz, and implied overrulings are extremely disfavored.  Scheiding v. Gen. Motors, 22

Cal. 4th 471, 478, 93 Cal. Rptr. 2d 342, 346 (2000).  Indeed, California cases after Dannenberg

continue to find a liberty interest and cite Rosencrantz.  Therefore, Biggs and McQuillion should

not, and cannot, be cast aside based on the ambiguities in California law unless the Ninth Circuit

so holds.

*2. Analysis*

The court now considers whether there was some evidence to support the panel's

finding of unsuitability.  As stated above, the 2003 hearing was petitioner's second suitability

---

[2] Dannenberg did find that California prisoners had no liberty interest in a *uniform* parole date, 34 Cal. 4th at 1098 (n.18), 23 Cal. Rptr. 3d at 443 (citing Rosenkrantz); however, this is a far cry from holding that the parole scheme as a whole does not create a conditional liberty interest.

1  hearing.  To put the findings of the panel in context, the court will first set forth the background of

2  petitioner's offenses, as summarized in the presentence report:

> Clifford Bair was a resident of the Bodega Bay area approximately two or three years ago and at that time did some yard work for Theresa Aiken a long-time resident of Bodega Bay, and commonly known as "The Mother of Bodega Bay." Apparently in more recent times the defendant and his ex-wife, Linda Bair, purchased a home in Visalia, California, where his ex-wife Linda was living in January of this year.  During 1983 the defendant apparently was working in the Los Angeles area for a construction company the name of which is in the District Attorney's file if you need it.

> On January 20th Linda Bair left Visalia and came to Bodega Bay to visit with family members and left the defendant at her home in Visalia without any transportation.  On Saturday night, January 20th, a very nice pickup truck was stolen in Visalia and turned up on January 24th at the Harbor View Motel in Bodega Bay in the possession of the defendant.  Mr. Bair checked into the Harbor View Motel at about noontime on January 24th and registered under a false name, address and city.  He prepaid for two nights at the motel.  This motel is within view of Mrs. Aiken's home and approximately 50-75 yards distance.

> On the morning of January 25th the defendant was seen in his motel room and the pickup truck was gone.  On January 26th the pickup truck was discovered about a mile and a half from Bodega Bay down a ravine totally burned up.  There were no license plates on the pickup when found.  Also on the 26th of January the defendant "checked out" of the Harbor View Motel and took with him all his trash including trash liners from trash cans and all the towels in the room.  No known reason for this conduct.

> Sometime in the afternoon of January 26th the defendant apparently purchased a six-pack of beer, a Dragger sandwich, a package of Peanuts and some potato chips at the Dry Dock Café in Bodega Bay.  The Dry Dock is within 75 yards of Mrs. Aiken's house and forms a triangle with Mrs. Aiken's home and the Harbor View Motel.  Apparently the defendant then went to Mrs. Aiken's home on foot where he somehow overpowered Mrs. Aiken, took her eyeglasses from her, rendering her almost blind, then tied her and gagged her and placed her underneath her bedding and mattresses on the floor of her bedroom.  He disconnected the telephone in the home.  At about 4:00 in the afternoon or 4:15, Rosie Formasi arrived at Mrs. Aiken's house to deliver her mail.  When she entered the home she was ordered by the defendant to lay down on the floor in the bedroom and not to look at his face.  He then tied up Rosie Formasi with the electrical wire cut from Mrs. Aiken's iron.  The defendant then left Mrs. Aiken's residence taking her eyeglasses and almost all of her keys and her car which was garaged in a separate detached garage.  Unfortunately for the defendant, he left behind at Mrs. Aiken's house two Budweiser beer cans, the wax paper from his sandwich, the paper bag for the potato chips, two paper napkins from the Dry Dock and the empty Tom's Peanut sack.  Rosie Formasi and Mrs. Aiken were eventually found the following morning at approximately 8:30 when a friend of Mrs. Aiken became concerned over the fact that her car was gone from the garage and could not get an answer on the telephone at the house.  Mrs. Aiken was dead when found and Rosie Formasi

1   was found in the living area of the house having crawled there during the night. Rose Formasi suffered from severe swelling of her hands as a result of having
2   been bound all night long.

3   Sometime during the night, probably between 10:00 PM and midnight, Mrs. Aiken's car became stuck in the shoulder of the Lakeville Highway across the
4   roadway from Gilardi's Resort.  This resort is located to the southeast of the city of Petaluma.  The defendant, having gotten the car stuck on the shoulder,
5   abandoned the car at that point and stole an oceangoing sailboat from the Lakeville Marina which is a part of Gilardi's Resort.  The defendant left in Mrs.
6   Aiken's car a Pepsi Cola can with a thumbprint on it, a Budweiser beer can, and other items which connect back to Mrs. Aiken's house.  Also in the car were
7   found all of the keys taken from Mrs. Aiken's and on the ground next to the car were Mrs. Aiken's eyeglasses.

8
9   Approximately 7:30 on the morning of January 27th, the owner of the sailboat arrived at the marina and discovered the sailboat gone from its berth.  He eventually found the sailboat up the Petaluma River stuck in the mud of the bank.
10  As he approached the sailboat, the defendant was observed on deck holding what appeared to be a shotgun or a length of pipe and ordered the owner of the boat not
11  to come any closer.

12  The owner retreated to the Lakeville Marina where he watched his boat through a monocular until the Sheriff's Department arrived.  During that period of time he
13  saw the defendant go over the side of the boat and disappear into the surrounding area.  The defendant was eventually found a short distance from the boat hiding in
14  a floodgate.  When he was arrested he was wearing clothing stolen from the boat and had on his person a flare gun and flare gun shells, also taken from the boat.
15  On his person were also shotgun shells.  The defendant was arrested and taken to Sonoma County Sheriff's Office.  At the Sheriff's Office, while waiting in an
16  interview room, the defendant cut one of his wrists with a piece of plastic in an apparent suicide gesture.  He was taken to Community Hospital for treatment and
17  while there he gave a brief statement to Detective Plass in which he admitted he had spent the night on the boat, that he had spent two days at the Harbor View
18  Motel, and that he had bought a six-pack of beer and a sandwich on the previous afternoon from the Dry Dock Café.  When he was asked if he had visited an older
19  lady on that previous afternoon, he said he could not remember.

20  Answer, Exhibit E.

21  In finding petitioner unsuitable, the BPT made the following findings:

22  The Panel has reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole
23  and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time.  The paramount reason would be the
24  timing and the gravity of the offense.  Mr. Bair, the offense was carried out in an especially callous manner.  There were multiple victims attacked, injured, or
25  killed in the same incident in that Theresa Blanch Aikens, she was 86 years of age, lost her life in this incident, as well as Rosie Formosie was accosted and tied
26  up.  And you had a loaded weapon, by the grace of God, more people weren't

hurt. You were going after your wife, you had some marital discord. You followed her. You stole a pickup truck and yet today, when we questioned you about why, you really couldn't answer why other than you just lost it and–The offense itself was carried out in a manner which demonstrates, let's see, an especially insensitive disregard for human sufferings. This 86-year-old woman, she deserved to live out the rest of he[r] life in peace. She was a well-respected member of the community–of her community, loved by all, and the motive for this crime was inexplicable and very trivial in relationship to the offense because of marital discord and distrust. These conclusions are drawn from the Statement of Facts wherein the prisoner embarked on–the prisoner embarked on a crime spree of sorts and all because of marital disputes with his wife or spouse intending to follow the–his wife, spy on her. You accosted Theresa Aikens, bound her, took her glasses. Another innocent bystander came to deliver mail and you forced her on the floor and bound her. And then you not only left there, went off, took her vehicle from there, then you got into a boat, took a boat. Nevertheless, these conclusions are drawn from the Statement of Facts where the victim–one of the victims lost her life. She was left bound and gagged under some bedding and a mattress. She died as a result of your actions. Previous record, the prisoner has an escalating pattern of criminal conduct, a history of unstable tumultuous relationships with others, coming from a dysfunctional family setting, an abusive father. The prisoner also has a problem with marriages, he's been in five different marriages. He's failed to profit from society's previous attempts to correct his criminality, such attempts included probation, county jail time, fines, restitution for fines. The prisoner has an unstable social history of prior criminality which includes as I mentioned earlier about the use and abuse of substances, illegal substances such as alcohol and drugs and possession of a–arrest for possession of a sawed-off shotgun. Institutional behavior, the prisoner has programmed in a limited manner while incarcerated. He's not sufficiently participated in beneficial self-help and therapy programming at this time. Parole plans, the prisoner lacks realistic parole plans in the last county of legal residence of the county of commitment, he does not have acceptable employment plans at this time. 3042 Notices indicate opposition to a finding of suitability, specifically–on, in terms of plans, I mean to mention as well, he does have some alternate plans in an alternate county. However, the county of commitment or the county of last residency, he has none. 3042 Notices, the Hearing Panel notes responses to 3042 Notices indicate an opposition to a finding of suitability, specifically the District Attorney's Office of Sonoma County w[h]here representatives here and present and they're in opposition to a finding suitability here today. Other information bearing on his suitability would be that the prisoner's counselor, a CC-I D.W. Nelson wrote in the current Board report of the prisoner that he would pose a moderate degree of threat if released to the public at this time, today. Remarks, the Panel makes the following findings: That the prisoner still needs therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner so that he can better understand the causative factors of why he did what he did, why he chased his wife half way across the state, stealing a vehicle, stealing several vehicles, and a vessel, and then accosting, causing the disruption of life for one of our senior citizens. And until progress is made, the prisoner continues to be unpredictable and a threat to others. The prisoner's gains are recent, and he must demonstrate the ability to maintain these gains over an extended period of time. Nevertheless, he should be commended for positive work reports, he's been a continuous–positive reports in the PIA metal fab, got a forklift operator's

16

1  License, participated in 2002 in the Conflict Resolution, as well as Phases Life
2  Skills in 2002 as well.  However, these positive aspects of his behavior don't
   outweigh the factors of unsuitability at this time.  This is another three-year
3  denial, Mr. Bair, and in a separate decision, the Hearing Panel finds that the
   prisoner has been convicted of murder and it is not reasonable to expect that
   parole would be granted at a hearing during the next three years.
4

5  Answer, Exhibit B, pp. 67-71.

6          The court now considers whether there was some evidence to support the BPT's

7  finding of unsuitability.  The panel first found petitioner unsuitable based on several unchanging

8  factors such as the circumstances of his commitment offense and unstable social history.  As

9  discussed above, in <u>Biggs</u> the Ninth Circuit found that a continuing reliance on unchanging factors

10 could violate due process.  The court does not find that the panel's reliance on these unchanging

11 factors violated due process because the 2003 hearing was only petitioner's second suitability

12 hearing.  These factors still had predictive value.[3]  Accordingly, the court considers whether some

13 evidence supported the BPT's finding of unsuitability based on these factors.

14         The panel first found that petitioner's offense involved multiple victims.  §

15 2402(c)(1)(A).  This finding was supported by some evidence because petitioner killed Ms. Aiken

16 and injured Ms. Fomasi.  The panel also found that the offense demonstrated an exceptionally

17 
18         [3] Whether the facts of the crime of conviction, or other unchanged criteria, affect the
   parole eligibility decision can only be predicated on the "predictive value" of the unchanged
19 circumstance.  Otherwise, if the unchanged circumstance per se can be used to deny parole
   eligibility, sentencing is taken out of the hands of the judge and totally reposited in the hands of
20 the BPT.  That is, parole eligibility could be indefinitely and forever delayed based on the nature
   of the crime even though the sentence given set forth the possibility of parole—a sentence given
21 with the facts of the crime fresh in the mind of the judge.  While it would not be a constitutional
   violation to forego parole altogether for certain crimes, what the state cannot constitutionally do
22 is have a sham system where the judge promises the possibility of parole, but because of the
   nature of the crime, the BPT effectively deletes such from the system.  Nor can a parole system,
23 where parole is mandated to be determined on someone's future potential to harm the
   community, constitutionally exist where despite 20 or more years of prison life which indicates
24 the absence of danger to the community in the future, the BPT commissioners revulsion towards
   the crime itself, or some other unchanged circumstance, constitutes the alpha and omega of the
25 decision.  Nobody elected the BPT commissioners as sentencing judges.  Rather, in some
   realistic way, the facts of the unchanged circumstance must indicate a *present* danger to the
26 community if released, and this can only be assessed not in a vacuum, after four or five eligibility
   hearings, but counterpoised against the backdrop of prison events.

1  callous disregard for human suffering. § 2402(c)(1)(D).  Petitioner gagged Mrs. Aiken, an elderly

2  woman, and placed her underneath her mattress.  He then bound Ms. Fomasi.  Leaving these

3  women in these conditions, particularly Ms. Aiken, demonstrated an exceptionally callous

4  disregard for human suffering.  This finding was supported by some evidence.

5  The panel next found that the motive for the crime was inexplicable or trivial in

6  relation to the offense. § 2402(c)(1)(E).  At the hearing, petitioner testified that he went to Bodega

7  Bay, where his wife was visiting family, because of marital problems.  Answer, Exhibit B, pp. 11-

8  12.  He had given up on life.  Id., p. 16.  When asked why he committed the crime against Ms.

9  Aikens, petitioner stated that it did not make any sense.  Id., p. 15.  He testified that Ms. Aikens

10  just happened to live in Bodega Bay and just happened to be where he was at the time.  Id., p. 16.

11  Ms. Formosi just stumbled into the situation.  Id., p. 16.  Based on petitioner's description of his

12  motive, the court finds that the BPT's finding that his motive was inexplicable or trivial was

13  supported by some evidence.

14  The panel next found that petitioner had a previous record of violence. §

15  2402(c)(2).  Petitioner had adult convictions for reckless driving, possession of amphetamines, a

16  fish and game violation for possession of a sawed off shotgun, loaded shotgun in a vehicle, under

17  the influence of alcohol or drugs and vandalism.  Answer, Exhibit B, p. 18.  These offenses did

18  not involve petitioner inflicting or attempting to inflict serious injury on a victim at least insofar

19  as the court can tell from this record.  Therefore, the BPT's finding of unsuitability based on §

20  2402(c)(2) was not supported by some evidence.  A finding of suitability can be based on the lack

21  of any significant history of violent crime. §2402(d)(6).  As far as this court can tell, the

22  convictions listed above do not demonstrate a significant history of violent crime.

23  The panel next found that petitioner had an unstable social history. § 2402(c)(3).

24  This finding was based on petitioner coming from a dysfunctional family with an abusive father

25  and his five marriages.  That petitioner came from a dysfunctional family and had an abusive

26  father was not petitioner's doing.  The court does not find that petitioner's family background

1  demonstrates petitioner's inability to have stable relationships.  Having been divorced does not

2  necessarily demonstrate a history of unstable or tumultuous relationships.  However, having been

3  divorced *five times* does indicate an unstable social history particularly when petitioner admitted

4  that his alcohol and drug abuse contributed to this pattern.  Exhibit B, p. 20.  Accordingly, the

5  court finds that this finding was supported by some evidence.

6         The panel also found that petitioner's institutional behavior supported a finding of

7  unsuitability. § 2402(c) (6).  Petitioner's disciplinary record included four 128(a)'s (chronos) for

8  failing to report to close count, covering his cell windows, smoking and refusing to perform a job

9  assignment.  Exhibit B, p. 23.  Petitioner received a rules violation for smoking on a work site.

10  Id., pp. 23-24.  This record does not demonstrate that petitioner engaged in serious misconduct

11  while in prison, as required by § 2402(c)(6).  Accordingly, this finding was not supported by some

12  evidence.

13         The BPT went on to discuss two of the factors tending to show suitability in §

14  2402(d) which it found petitioner did not meet.  The panel found that petitioner had not

15  programmed sufficiently (§ 2402(d)(9)) and lacked realistic parole plans (§ 2402(d)(8)).  With

16  respect to programming, the panel stated that petitioner had not sufficiently participated in

17  beneficial self-help and therapy programming and had programmed in a limited manner.  Exhibit

18  B, p. 69.  At the hearing, the BPT noted that petitioner had completed his Alternatives to Violence

19  and Anger Management Program.  Exhibit B, p. 23.  Petitioner had also participated in NA/AA

20  since June 8, 2001.  Id.  He also enrolled in the Friends Outside Creative Conflict Resolution

21  Program.  Id., p. 24.  This program involved three eight hour sessions emphasizing values and

22  strengths while learning and practicing appropriate anger management and conflict resolution

23  skills.  Id., p. 25.  The BPT read into the record portions of the psychological report prepared by

24  Dr. Macomber:

25         Mr. Bair related in an outgoing serious and cooperative manner.  He was alert and
            well oriented.  His thinking was rational and logical.  His speech was normal,
26         fluent and goal oriented.  He is functioning in the high average ranges

intellectually. The affect was appropriate. He related to the–in the interview in an earnest, sincere, open, non-defensive manner. He spoke at some length about how there is no excuse for his behavior in the commitment offense and he appears to be very aware of the great seriousness of his criminal behavior. He impresses as being a very sincere individual with considerable feelings of remorse and sorrow about the commitment offense. There is no indication of any mental or emotional problems in the interview.

*****

He is described–has been described as having an antisocial personality disorder in the past. However, this diagnosis is not appropriate in that he does not meet the criteria for this classification. This man is certainly not criminally oriented in any way. He's also been described as having borderline features in the past. This does not appear to be appropriate although he does not have a pattern of unstable interpersonal relationships which is typically seen in individuals with borderline personality problems. However, these individuals usually continue to act out their emotional distress with repetitive self-destructive behavior which we haven't seen throughout the last 15 years of observation. What does appear to be evident is a passive aggressive personality disorder in which he tends to repress frustration, disappointment and anger, and lets it out in inappropriate and self-destructive as well as overtly destructive ways. This personality characteristic seems to be improving with the years and with his age. At this point in time he has matured a great deal and has shown considerable growth and maturity. It does not appear that the prior personality disorder problems are really evident at this point in his life.

Exhibit B, pp. 38-39.

A copy of Dr. Macomber's report, prepared July 26, 1999, is attached as an exhibit to the petition. In his assessment of petitioner's dangerousness, Dr. Macomber stated,

There has been research done where the results have indicated factors indicating both a high risk for recidivism as well as a low risk of recidivism. Factors in this case associated with a higher risk for recidivism are his history of substance abuse, a family history of a father who was a serious alcoholic, as well as the history of rather severe physical abuse as a child. Factors indicating a lower risk of re-offense are this man's good institutional adjustment over the years, his stable work history, before and after his incarceration, his lack of violence before the offense as well as since he has been incarcerated and the obvious growth and maturity that has occurred since his initial incarceration.

The assessment of dangerousness within the controlled setting of the institution is seen as below average in comparison to other inmates. Assessment of dangerousness if released to the community is also below average in comparison to other inmates. Significant risk factors in this case would be any use of alcohol or drugs.

\\\\\

20

CLINICIAN OBSERVATION/COMMENTS/RECOMMENDATIONS: There is no evidence of mental or emotional problems that would preclude routine release planning in this case. There is no evidence of mental problems that would require further diagnosis or participation in psychotherapy. This man's reasons for not participating in Alcoholics Anonymous or Narcotics Anonymous appear to be legitimate. However, it is recommended that he participate in some kind of substance abuse program for educational reasons prior to his release. This man's statements of remorse appear to be quite sincere. The probability of him getting into serious trouble in the future is very very small. He is quite happy with his current program which keeps his welding skills current. There are no other psychological recommendations.

The only therapy recommended by Dr. Macomber was for petitioner to participate in a substance abuse program for educational reasons. At the time of the July 25, 2003, suitability hearing, petitioner had been attending NA/AA since June 8, 2001. Petitioner's attendance of NA/AA for two years satisfied Dr. Macomber's recommendation. The court finds that the BPT's finding that petitioner required additional therapy was not supported by some evidence.

The BPT also found that petitioner had not sufficiently programmed, apparently referring to petitioner's post-incarceration vocational history. While petitioner had worked several different jobs since his incarceration, he had not signed up for an actual vocational program. Id., p. 26. Petitioner told the BPT that he had not signed up for a vocational program because he was already a journeyman plumber, a certified welder and a heavy equipment operator. Id., p. 26. In addition, petitioner kept his job in the Prison Industry Authority because he earned money in that position. Id., p. 28.

The BPT's expectation that petitioner participate in a vocational program prior to his release was not unreasonable. While petitioner was apparently trained in other fields, his participation in a vocational program would help increase his chances of finding employment following his release from prison. Accordingly, the court that the BPT's finding that petitioner had not adequately programmed was supported by some evidence.

The panel found that petitioner lacked realistic parole plans in Sonoma County, the county of commitment. Petitioner stated that if paroled, he planned to live with his wife in Roseville, which is located in Sacramento County. Exhibit B, p. 42-43. Petitioner had no job

1   offers.  Id., p. 47.  Instead, he had offers of interviews.  Id.

2          Cal. Penal Code § 3003(a) provides that an inmate released on parole shall be

3   returned to the county that was the last legal residence of the inmate prior to his or her

4   incarceration.  This section also provides that an inmate may be returned to another county if that

5   would be in the best interests of the public.  Cal. Penal Code § 3003(b).  In making its decision

6   regarding whether to parole an inmate to another county, the paroling authority shall consider a

7   variety of factors including the verified existence of a work offer and the existence of family in

8   the other county with whom the inmate has maintained strong ties and whose support would

9   increase the chance that the inmate's parole would be successfully completed.  Cal. Penal Code §

10   3003(b)(3), (4).

11          While petitioner's wife lived in Sacramento County, petitioner had no verified job

12   offers from that county or from any other county for that matter.  Under these circumstances,

13   petitioner did not demonstrate that the best interests of the public would be served by return to

14   Sacramento County rather than to his county of commitment.  Because petitioner's parole plans

15   were sketchy, the court finds that there was some evidence to support the BPT's finding that he

16   lacked realistic plans for the future.

17          For the reasons discussed above, the court finds that the 2003 decision by the BPT

18   was supported by some evidence.  The court observes that several additional factors tended to

19   show petitioner's suitability such as his lack of a juvenile record (§ 2402(d)(1)), his demonstration

20   of remorse (§ 2402(d)(3)) and age, 58 (§ 2402(d)(7)).  The court need not consider these factors at

21   this time because some evidence supported the unsuitability finding.

22          As discussed above, this claim should be denied pursuant to Sass, supra.  The court

23   respectfully requests that the district court reconsider Sass and deny this claim on the grounds

24   discussed above.

25   \\\\\

26   \\\\\

1          B. Penal Code § 3041

2          In claim one, petitioner argues that Cal. Penal Code § 3041 requires the BPT to

3 give him a parole date.  This claim is also barred pursuant to Sass, supra.

4          The court respectfully requests that Judge England reconsider Sass and deny this

5 claim on these alternative grounds.  Section 3041 provides that one year prior to the inmate's

6 minimum eligible parole release date a panel consisting of at least two commissioners of the BPT

7 shall meet with the inmate and *shall normally* set a parole release date.  Petitioner appears to

8 argue that because § 3041 provides that the BPT shall normally set parole release dates, the BPT

9 violated due process by failing to set his parole release date.

10          As discussed above, California's parole scheme gives rise to a cognizable liberty

11 interest in release on parole.  Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003).  "In the parole

12 context, the requirements of due process are met if 'some evidence' supports the decision."  Id.  If

13 there is not some evidence to support a decision denying parole, due process is violated.

14 Therefore, even though California law states that the BPT shall normally set parole release dates,

15 due process does not require the BPT to state a date where some evidence exists demonstrating

16 that petitioner should not be paroled.  Accordingly, petitioner's claim that the BPT was required

17 to set his parole release date pursuant to Cal. Penal Code § 3041 is without merit.

18          C. Disproportionate Sentence

19          Petitioner argues that his sentence is disproportionate to his offense.  In essence,

20 petitioner is arguing that his sentence violates the Eighth Amendment.

21          Petitioner's Eighth Amendment "proportionality" claim is difficult to assess in the

22 context of the case.  To the extent that petitioner is claiming that his original 27 years to life

23 sentence was excessive, the present petition is not the vehicle to attack that long ago pronounced

24 sentence.  To the extent that petitioner is contending that the BPT has, in effect, given him a life

25 without the possibility of parole sentence, petitioner's claim lacks merit at this time.  The BPT, of

26 course, has no actual power to sentence petitioner under California law.  Petitioner's claim here is

1 in reality a reprise of his no substantial evidence claim, especially that directed to the nature and

2 seriousness of the crime factor of parole eligibility.  Petitioner is frustrated because he senses what

3 the court has described—having BPT assess what is "more than minimally necessary to convict"

4 is a standardless review subject to the arbitrary decisions of BPT commissioners—BPT

5 commissioners can *in effect* ignore the possibility of parole forever based on their own view of the

6 crime, thereby making petitioner's sentence a de facto life without the possibility of parole.

7 However, *at this time* and for the reasons stated previously, the court cannot find a violation of

8 petitioner's liberty interest.  Having already adjudicated that claim adverse to petitioner, the court

9 will not repeat the analysis.

10        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

11 writ of habeas corpus be denied.

12        These findings and recommendations are submitted to the United States District

13 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

14 days after being served with these findings and recommendations, any party may file written

15 objections with the court and serve a copy on all parties.  Such a document should be captioned

16 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17 shall be served and filed within ten days after service of the objections.  The parties are advised

18 that failure to file objections within the specified time may waive the right to appeal the District

19 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20 DATED: 9/12/05

21

22                                        /s/ Gregory G. Hollows

23                                        _____
                                         GREGORY G. HOLLOWS
                                         UNITED STATES MAGISTRATE JUDGE
24

ggh:kj
25 bair2257.fr

26

                                         24